**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **GEORGE ZIMMERMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 14 C 5300** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.
Procedural History**

The plaintiff, George Zimmerman, on behalf of his deceased wife, the original claimant, Claudette Hurt, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying Ms. Hurt's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §423(d)(2). Ms. Hurt, passed away on February 8, 2014, succumbing to squamous cell carcinoma.[1] Mr. Zimmerman asks the court to reverse the Commissioner's decision and order benefits to be paid, remanding the case for payment, or, in the alternative, remand the case for consideration of the issues raised by the Mr. Zimmerman in his brief, while the Commissioner seeks an order affirming the decision.

In the context of the current appeal, Ms. Hurt first applied for DIB on May 21, 2008, due to Scheuermann's Kyphosis (R. 110-113), a deformity of the curve of the spine, and secondary

---

[1] On March 28, 2014, Ms. Hurt's counsel filed a *Notice of Substitution of Party* substituting George Zimmerman, Ms. Hurt's widower, for Ms. Hurt. (R. 294, 289).

diagnoses of degenerative arthritis and diabetes. (R. 20). Her application was denied initially on August 13, 2008, and upon reconsideration on December 8, 2008. (R. 17, 50-52, 65-67). Ms. Hurt requested a hearing and, on December 1, 2009, appeared and testified without representation, before an ALJ. (R. 26-49). In addition, Cheryl Hoiseth testified as a vocational expert. (R. 45-48). On February 4, 2010, the ALJ issued a decision finding that Ms. Hurt was not disabled because she could perform her past relevant sedentary work in data entry. (R. 17-22). This became the final decision of the Commissioner when the Appeals Council denied Ms. Hurt's request for review of the decision on November 12, 2010. Ms. Hurt subsequently filed a civil action in the United States District Court for the Northern District of Illinois on January 26, 2011. (R. 438). On July 30, 2012, this court issued a *Memorandum Opinion and Order* remanding the case to the Social Security Administration (SSA) for further administrative proceedings. *Hurt v. Astrue*, No. 10 C 8301, 2012 WL 3101712 (N.D. Ill. July 30, 2012).

The ALJ convened the remand hearing on March 14, 2013, at which Ms. Hurt, represented by counsel, appeared and testified.[2] (R. 347). In addition, Dr. Carl Leigh, and Glee Ann Kehr appeared and testified as a medical expert and a vocational expert, respectively. *Id.* On April 24, 2013, the ALJ issued a partially favorable opinion for Ms. Hurt where he found that under Sections 216(I) and 223(d) of the Social Security Act Ms. Hurt was eligible for DIB as of May 2011. (R. 333). However, in this second opinion the ALJ reiterated his original holding that Ms. Hurt was not disabled, and thus not entitled to DIB, for the period beginning April 2008 and ending May 2011. Once again, the ALJ found that Ms. Hurt retained the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §404.1567(b) with limitations, including a manipulative limitation of no more than frequent gross manipulation (handling),

---

[2] While Ms. Hurt's original application was pending on appeal, Ms. Hurt submitted a new application for disability benefits on January 31, 2011. However, for purposes of administrative efficiency, as part of the ALJ's second opinion the 2011 application was consolidated with the earlier application. (R. 321).

during this period, and thus that she was capable of performing past relevant work as a data entry clerk during this time.  (R. 328, 335).

Plaintiff appealed the unfavorable portion of the ALJ's decision to the Appeals Council. On April 24, 2014, the Appeals Council declined review of the ALJ's decision, rendering it the final administrative decision by the Commissioner.  (R. 304-307).  *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994); 20 C.F.R. §404.981.  Plaintiff has now appealed to this court pursuant to 42 U.S.C. §405(g), and both parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. §636(c).

## II.
## The Record Evidence

### A.
### The Vocational Evidence

Ms. Hurt was born on December 20, 1951, making her almost fifty-nine years old at the time of the ALJ's original decision and sixty-two years old at the time of the ALJ's second decision.  (R. 110).   Although Ms. Hurt had a brief stint as a retail employee in a pharmacy and worked briefly as a city bus driver during a portion of 2009, her most recent regular job was as a bus driver for handicapped persons from 2004 to 2008.  (R. 375, 153).   Prior to that she also worked for a short time as a store clerk, and worked in an office doing computer data entry for Easter Seals Rehabilitation Center.  (R. 153).

### B.
### The Medical Evidence

Ms. Hurt's primary impairments, prior to being diagnosed with squamous cell carcinoma on July 1, 2012, were her myriad back problems.  (R. 324).  She had Scheuermann's Kyphosis, a defect in the curve of the spine resulting in a rounding or bowing of the back, and had had two surgeries on her spine – a discectomy and a multilevel spinal fusion – and was a candidate for a

third, at the time of her first hearing.  (R. 218, 265, 276, 284).   The spinal fusion involved the T12, L2, L4, and L5 levels of her spine.

In January 2007, Ms. Hurt was complaining of back pain extending into both legs.  (R. 287).  She had an MRI that revealed minimal facet hypertrophy at L2-3, and bilateral facet hypertrophy at L4-5.  (R. 287-88).  Rajit S. Shetty, MD, tasked with reading the MRI, observed:

> There is moderate to severe central canal stenosis.  Mild to moderate left-sided neural foraminal narrowing and moderate right-sided neural foraminal narrowing are identified.  Fluid is noted within the facets.  Slight lateral recess narrowing is noted bilaterally at L4.

(R. 287).   Based on these observations, Ms. Hurt's physician, Dr. Ronjon Paul, who had originally ordered the MRI, described the stenosis as "quite severe." (R. 284, 287).  Further, although Dr. Paul believe that Ms. Hurt might be in need of yet another fusion, given her past surgical history, he recommended conservative treatment for the time being. (R. 284)

That treatment initially came in the form of multiple epidural steroid injections.  Ms. Hurt had two at the L4 level of her lumbosacral spine on March 21, 2007.  (R. 216, 278-281). That seemed to relieve her back pain, but she continued having leg pain extending down to her ankles.  (R. 273).  Additionally, she received a caudal injection at the base of her spine on April 10, 2007.   *Id.*   However, shortly after that procedure, on April 27, Ms. Hurt was again complaining of lower back and leg pain.  Following these complaints, she received two additional injections at the L3 level of her lumbosacral spine.  These proved to be ineffective, and, in the end, all of these treatments provided Ms. Hurt with only "minimal temporary relief." (R. 269).

Following these treatments, Ms. Hurt next turned to physical therapy.  By June 12, 2007, this course had resulted in such a significant improvement of Ms. Hurt's back and leg pain that Dr. Paul released Ms. Hurt for full time work driving a bus for disabled individuals with "no

restrictions" beginning June 25, 2007. (R. 267). Unfortunately, Ms. Hurt's relief did not last and her return to employment was brief. By March 2008, she was once again complaining of severe pain that was exacerbated by walking any distance or lying on her right side. (R.263). By this point Dr. Paul noted that Ms. Hurt was "having pain mostly at her greater trochanters bilaterally," and that she was suffering from back pain, sciatica, and a general tenderness that was more acute on her left side than her right. (R. 265).

On July 16, 2008, Ms. Hurt underwent the first of the two state consultative examinations for the Bureau of Disability Determination Services (DDS) relevant to this case. (R. 217). This first examination was conducted by Dr. Chukwu Emeka F. Ezike. During his examination of Ms. Hurt, Dr. Ezike noted that Ms. Hurt continued to complain of progressively worsening back pain despite two surgeries. (R. 217). She was taking three medication to combat her pain: Tramadol, Flexeril, and Celebrex. (R. 218). During the consultation, Ms. Hurt described a constant, dull, and occasionally sharp pain, of approximately 8/10 in severity that radiated to both lower extremities from her hips to her toes. (R. 217). Further, Ms. Hurt described an associated numbness in her extremities on her lower left side, and explained that in the normal course of her daily activities that she could only walk for 15 minutes, stand for 15 minutes, and sit for about 30 minutes at a time. (R. 218). Additionally, Ms. Hurt complained of arthritis in her thumbs and pain in her knuckles, and explained that she had occasional hand weakness which resulted in dropping of objects and difficulty opening jars and bottle tops. (R. 217)

During his examination of Ms. Hurt, Dr. Ezike found that Ms. Hurt was able to get on and off the exam table with no difficulty, that she could walk greater than 50 feet without support, that her gait was non-antalgic without the use of assistive devices, and that she was able to perform a toe/heal walk. (R. 219). Further, Dr. Ezike found that Ms. Hurt had a normal range

of motion in her extremities and that her straight leg raising was "equivocal" bilaterally. (R. 219). As to her hands, Dr. Ezike found that Ms. Hurt's grip strength was 4/5 in both hands, that she possessed a normal ability to grasp and manipulate objects, and that she was able to pick up a penny with each hand. However, Dr. Ezike noted that Ms. Hurt's pinch strength was minimally decreased bilaterally. (R. 219). Following his examination of Ms. Hurt, Dr. Ezike noted that Ms. Hurt's overall effort and cooperation were satisfactory and that "she seemed reliable." (R. 217, 219).

As a result of his examination of Ms. Hurt, Dr. Ezike diagnosed Ms. Hurt with kyphosis, (status post-surgery), spinal stenosis, (status post-surgery), osteoarthritis with pain in the lower back, hips and hands, and lumbar radiculopathy. (R. 220). Additionally, Dr. Ezike noted a healed midline surgical scar over Ms. Hurt's spine from the base of her neck to her waistline.

Based on Dr. Ezike's evaluation, Dr. Virgilio Pilapil completed a physical RFC assessment for DDS on August 7, 2008. He found that Ms. Hurt could lift 50 pounds occasionally, 25 pounds frequently; stand/walk for about six hours, sit for six hours; frequently balance; and occasionally climb ramps/stairs. (R. 223,224, 299; *Hurt*, 2012 WL 3101712, at *2). Following, the initial denial of Ms. Hurt's disability claim on August 13, 2008, on December 4, 2008, Dr. Charles Kenney, also non-examining, confirmed Dr. Pilapil's RFC. (R. 231). Neither the reviewers nor Dr. Ezike saw any evidence from Ms. Hurt's treating physician. (*Hurt*, 2012 WL 3101712 at *2).

On May 28, 2011, Ms. Hurt underwent the second of the two state consultative examinations for the DDS relevant in this case. (R. 684). This second examination was conducted by Dr. Albert Osei. During his examination, Dr. Osei noted that Ms. Hurt continued to complain of a constant lower back pain radiating to both her hips and ankles of approximately

7/10 in severity that increased in intensity to 9/10 during cold weather or activity such as walking up to 30 minutes. (R. 684). Additionally, Dr. Osei noted that Ms. Hurt used an ice pack, heating pad, rest and Tramadol to attempt to relieve this pain and that these efforts were on most occasions successful. Dr. Osei also noted that Ms. Hurt complained of a constant pain in her right shoulder, located in the upper scapular region, that had been ongoing for several months, and that, when severe, this pain entailed a stabbing component. (R. 685). Dr. Osei noted that, on most occasions, Tramadol, ice packs, heating pad, and rest relieved her pain. (R. 685).

As to Ms. Hurt's hands, Dr. Osei observed that Ms. Hurt had hand pain mostly located at the thumb area that had been ongoing for several months, that the pain was present most of the time, that Ms. Hurt had had a decreased ability to grip objects and that she occasionally dropped objects, that she could not open jars, that she was able to write only after the use of a heating pad or rubbing of her hands, but that she had no difficulty buttoning or zipping. (R. 685).

During his examination of Ms. Hurt, Dr. Osei found that Ms. Hurt was able to get on and off the exam table with no difficulty, that she could walk greater than 50 feet without support, that her gait was non-antalgic without the use of assistive device, that she could perform a toe/heel/tandem walk, and that she could squat and hop on either leg. (R. 686). Further, although Dr. Osei found that the range of motion for Ms. Hurt's left shoulder, elbows, and wrists was normal, he did find that the range of motion for her cervical spine, lumbar spine and right shoulder joint was reduced with complaints of pain. (R. 686). Additionally, Dr. Osei noted that Ms. Hurt's straight leg raise test was "negative" bilaterally. (R. 686). As to her hands, Dr. Osei found that Ms. Hurt's grip strength had fallen to 4+/5, that she had a normal ability to grasp and manipulate objects, that she was able to fully extend her hands, make fists and appose her

fingers, and that the Finkelstein test was positive bilaterally. (R. 686). Following his examination of Ms. Hurt, Dr. Osei noted that Ms. Hurt was "appropriate, polite, pleasant and cooperative," and that "[s]he seemed reliable." (R. 684, 687).

As a result of his examination of Ms. Hurt, Dr. Osei observed that Ms. Hurt had (1) a history of kyphosis (status post-surgical intervention) with complaint of chronic pain, (2) a reduced range of motion of the lumbar spine with complaint of pain, (3) right scapular pain with reduced range of motion of the right shoulder joint, (4) a reduced range of motion of the cervical spine with complaint of pain, (5) complaints of hand pain with mildly reduced handgrip and a positive Finkelstein's test, and (6) diabetes mellitus.[3] (R. 687). Additionally, Dr. Ezike noted a long surgical scar from Ms. Hurt's cervical region to her lumbar region and a surgical scar at the right scapular region. (R. 686).

In April 2012 and June 2012, Ms. Hurt visited the VNA Health Center in Aurora, Illinois complaining of a sore in her tongue and pain on the left side of her face. (R. 699, 703). On August 17, 2012, Ms. Hurt was diagnosed by biopsy with invasive squamous cell carcinoma. (R. 718). As a result of this diagnosis, oncologist Parthiv S. Mehta, M.D., at Rush-Copley Medical Center, recommended a partial glossectomy and modified neck dissection on the left side, in addition to "radiation therapy plus or minus chemotherapy." (R. 724). Following surgery and the completion of six weeks of chemotherapy and radiation treatment, Dr. Satitha Reddy indicated that Ms. Hurt was experiencing significant complications: Ms. Hurt became unable to swallow, leading to dependence on a feeding tube; she lost substantial amounts of weight, and she was hospitalized due to dehydration and the resulting acute renal failure. (R.

---

[3] Early during the consultation Dr. Osei noted that Ms. Hurt indicated that she had had "diabetes mellitus for the past one year," but that she could not "site [sic] any complications from it." (R. 685).

726, 731).  In addition, the cancer spread, and Ms. Hurt passed away on February 8, 2014.  (R. 294).

### C.
### The Testimony at the Administrative Hearing Testimony

### 1.
### The 2009 Administrative Hearing Testimony

### a.
### Ms. Hurt's Testimony

At the first administrative hearing, Ms. Hurt testified that she was unable to work because of her spinal impairment and degenerative arthritis, and that she was currently awaiting her third major back surgery.  (R. 34; *see id.*)(In response to the ALJ"s question "Why can't you work?" Ms. Hurt stated "Because I have Sherman Kyphosis and degenerative arthritis, and I need a third major back surgery.  And the degenerative arthritis has gotten so severe that it's affecting all my joints, besides needing the third back surgery.").  Ms. Hurt stated that she last worked in April of 2008 as a city bus driver, that she had pursued this job as a result of her husband's unemployment, but that the pain had been too severe and that she had been forced to leave after less than two weeks of training.  (R. 32-33).

Ms. Hurt also testified that she had left her previous long-term employment position, as a bus driver of handicapped persons, because the wheelchair pushing component of the job caused too much pain in her back, shoulders, and knees.  (R. 33).  Additionally, Ms. Hurt stated that she had been forced to leave a data entry job that she had held before the public transportation job because of the pain in her back.  She testified that being forced to sit for long periods of time while twisting from one computer to another was too painful, and that, although she was allowed to stand up and move around, she was not allowed to work while standing, and therefore her condition prohibited her from performing the job's requirements.  (R. 41-43).

9

When asked by the ALJ if she had pain "right now," Ms. Hurt indicated that she did. (R. 39). When asked in the ALJ's follow up question where she had pain, Ms. Hurt stated that it was in her shoulders, back, knees, toes, and knuckles. (R. 39). However, while the ALJ failed to ask how severe the pain was, he did ask if Ms. Hurt was currently taking pain medication. (*Hurt*, 2012 WL 3101712, at *3). Ms. Hurt stated that she was not taking pain medication, but in response to a separate series of questions she did indicate that she was currently taking oral medication for her diabetes and Celebrex for her arthritis. (R. 40). Further, Ms. Hurt testified that she was currently seeing her doctor once a month. (R. 40).

The ALJ spent some time questioning Ms. Hurt regarding her daily activities. (R. 37-40). In response to this questioning, Ms. Hurt testified that she was able to drive, cook, wash dishes, do laundry, and vacuum in stages. (R. 37). Further, Ms. Hurt testified that she had a cat, did not own a computer, watched television, was not involved in crafts or hobbies, did no gardening, did not travel long distances outside of the Chicago area, did not smoke, and enjoyed reading romance novels. (R. 38-39). When asked about her shopping habits, Ms. Hurt indicated that she did shop for groceries, usually at Jewel, and that she did sometimes go to the mall or other stores like Walmart to shop, but that she "usually" did not shop for groceries alone. (R. 38). Additionally, Ms. Hurt testified that she could not stand or walk for more than 10-15 minutes without having to sit down, that she thought she could lift 10 pounds, and that, although she had had trouble with her balance, she had never fallen down. (R. 39).

### b.
### The Vocational Expert's Testimony

Following Ms. Hurt's testimony, Cheryl Hoiseth testified as a vocational expert ("VE"). To begin with, Ms. Hoiseth testified as to the classifications into which Ms. Hurt's previous jobs would fall. Based on the circumstances, Ms. Hoiseth classified Ms. Hurt's bus driving job as

semi-skilled "light" work, and Ms. Hurt's previous data entry job as semi-skilled "sedentary" work.  (R. 45).

Next, to assist the ALJ in making his RFC determination, the ALJ gave Ms. Hoiseth a series of hypotheticals involving an individual with either Ms. Hurt's alleged work capacity or a modified version of Ms. Hurt's alleged work capacity, and asked Ms. Hoiseth to determine whether or not this individual would be able to perform Ms. Hurt's previous jobs either as she performed them or as they were customarily performed.  In the first hypothetical, the ALJ asked Ms. Hoiseth to assume a person over 55 years old, with Ms. Hoiseth's education, work experience, and skill, who was able to lift up to 20 pounds occasionally, lift or carry up to 10 pounds frequently, and perform light work, but who would be unable to work at unprotected heights and who would be unable to crawl or climb ladders, scaffolds, or ropes.  (R. 45-46).  In response to this hypothetical, Ms. Hoiseth testified that the person described could do Ms. Hurt's bus driving work and the data entry, "but bus driving as she performed it, not in, not according to the DOT (Dictionary of Occupational Title."[4]  (R. 45, 46).

In his second hypothetical, the ALJ asked a modified version of the first hypothetical.  This time the person could perform only sedentary work with the same additional restrictions contained in the first hypothetical.  (R. 46).  In response to this question, Ms. Hoiseth testified that this hypothetical person would only be capable of doing Ms. Hurt's past data entry work.  (R. 46).  In his last hypothetical, the ALJ modified his second hypothetical by including the caveat that the person would have an option to sit or stand alternatively at will as long as the person would not be taken off task for more than 10 percent of the work period.  In response to this question, Ms. Hoiseth testified that this hypothetical person would also be capable of performing Ms. Hurt's past work in data entry.  (R. 47).

---

[4] *See* R. 44 (Ms. Hoiseth testifying that "In the Dictionary of Occupational Titles, bus driver is medium . . . .").

Finally, the ALJ asked Ms. Hoiseth what acceptable levels of break time and absence would be in the context of full-time, competitive work.  In response, Ms. Hoiseth testified that absences could not exceed more than a day and a half a month, and that normal breaks during a regular workday include a morning and afternoon break, of 10 to 20 minute duration, and a lunch break, of 30 to 45 minute duration.  (R. 47).

**2.**
**The 2011 Administrative Hearing Testimony**

**a.**
**Ms. Hurt's Testimony**

In response to the ALJ's queries, Ms. Hurt testified that she had stopped working on a regular basis in 2008 due the pain in her back, hands, and legs.  (R. 376).  Ms. Hurt did state that she had worked for several weeks in 2009 as a retail associate at a pharmacy, and that she had briefly tried to return to bus driving that same year.  She had, because her husband had lost his job.  (R. 392).  But that the walking required by the pharmaceutical job was "too much for me" and the pain in her back, hands, and legs forced her to forego her renewed attempt at bus driving. (R. 375, 376, 392).

Ms. Hurt testified that in the last 15 years, the only two jobs that she had "really had" were her bus driving job for the city of Aurora and a data entry job for Easter Seal Rehabilitation Center.  (R. 374 -375).  As to the bus driving job, Ms. Hurt testified that it entailed her driving a small 15 passenger bus for senior citizens and handicapped adults and occasionally loading and unloading the passengers' groceries.  Regarding her claimed disability, Ms. Hurt testified that at the time she quit the bus driving job she was experiencing pain all across her lower back and all the way down her legs, that it hurt to hold the steering wheel, and that she was forced to constantly change positions on the steering wheel so as to hold it "where it eliminated [her]

thumbs so [she] mostly was doing it [steering] with [her] fingers." (R. 384, 390). As to the data entry job, Ms. Hurt testified that it exclusively entailed data entry, that there was no lifting involved, and that she was seated for most of the day. (R. 374).

Following the discussion of Ms. Hurt's past work history, the ALJ then began asking a series of questions aimed at determining Ms. Hurt's functionality in her daily activities during the period following her original alleged onset date of April 2, 2008. Ms. Hurt once again testified that she had been able to do things around her apartment like cooking, cleaning and laundry, but that her condition forced her to do these activities "in stages." (R. 377). Thus, she could prepare meals or vacuum, but she was only capable of standing for 15 minutes at a time, and therefore was unable to complete these tasks without breaks. (R. 377, 382). Ms. Hurt testified that although sitting during these breaks would relieve the pain for a while, sitting for more than a half-hour itself caused pain and discomfort. (R. 391). The there was her hand pain, which also affected her activities. It was exacerbated when she prepared meals – chopping or peeling vegetables. (R. 389). Again, the pain would become intolerable after about fifteen minutes and she'd have to take a break. (R. 390).

Additionally, Ms. Hurt stated that in April 2008 although she had been able to drive the one mile or so to the grocery store, that she had only been able to do this once a week, that she "usually had to rest the days in between I did something because it was pretty exhausting," and that her condition also required that she do her shopping in stages, with rests in between bringing in the groceries and putting them away. (R. 381, 392).

**b.**
**Dr. Carl Leigh's Testimony**

In Ms. Hurt's second administrative hearing, Dr. Carl Leigh testified as a medical expert. (R. 352). Dr. Leigh began his testimony by stating that, based on the medical evidence in the

record, as of July 1, 2012 Ms. Hurt's cancer met the listings 13.02D and 13.02E under 20 CFR Part 404, Subpart P, Appendix 1, thus making her cancer "severe enough to prevent (Ms. Hurt) from doing any gainful activity," (20 C.F.R. §404.1525 (2011)) and therefore entitling her to DIB as of that date. (R. 355-356). Specifically, Dr. Leigh testified that Ms. Hurt's condition satisfied listing 13.02D as "she's had cancer of the head and or/neck, with more than one mode of antineoplastic treatment," and that her treatment met listing 13.02E, due to the fact that she has undergone three types of antineoplastic treatments, "surgery, chemo, and radiation." (R. 356).

Dr. Leigh then began discussing the conclusions he had reached regarding Ms. Hurt's condition and her RFC based on his examination of the records from Dr. Osei's May 28, 2011 state consultative examination of Ms. Hurt. (R. 357). Dr. Leigh testified that, in his opinion, from April 2, 2008 until Ms. Hurt's medical impairments met listing 14.03, Ms. Hurt's other medical impairments did not meet or equal any other listing in the Regulations. (R. 363). Specifically, Dr. Leigh stated that he had considered listing 1.04 for Ms. Hurt's hand and listing 1.02 for her shoulder, but had found that these impairments simply limited Ms. Hurt's RFC, but did not preclude her from doing any gainful activity. (R. 363). Dr. Leigh testified that based on the limitations resulting from the pain in Ms. Hurt's back, hand, and shoulders,[5] that she would be limited to a "light RFC, specifically occasionally lifting and carrying 20 pounds; frequently 10 pounds; standing and walking, sitting, each six hours out of an eight-hour workday," that she "must avoid climbing totally, climbing ladders, scaffolds, ropes," that she must limit "climbing ramps, stairs; bending, kneeling, crouching, and crawling" to occasional, that she must limit

---

[5] *See* R. 358 ("All right, that same consultative examination of 5/28/11, indicates pain between the upper and lower back radiating through hips and ankles, aggravated by the cold, cold weather, I mean. She was also experiencing pain in the hand, especially at the thumb, with difficulty in gripping, opening jars – jars – and causing her to drop them.").

"handling with the right hand" to frequently and overhead reaching with the right arm to "occasionally," that she must "avoid concentrated exposure to extreme cold," avoid even moderate exposure to "slippery, broken, uneven, or obstructed surfaces," avoid even moderate exposure to "vibrations," and abstain from "commercial driving" and the operation of hazardous machinery. (R. 362, 363). However, immediately following this testimony, Dr. Leigh went on to revise his testimony regarding the frequency with which Ms. Hurt could be expected to use her right hand. (R. 363). Here, Dr. Leigh indicated that he would "have to say that handling is reduced from frequently to occasionally," as a result of Dr. Osei's notes to the effect that Ms. Hurt had a "decreased ability to grip, and occasionally [dropped] objects," and that she could not open jars. (R. 363). Dr. Leigh did indicate, following this revision in his testimony, that he would be unable to determine how far back that limitation went, and that he couldn't "say that it didn't, wasn't present in April of '08, but [that] there's no indication that I'm aware of that she was limited so severely in gross manipulation." (R. 364)

Dr. Leigh did testify that according to Dr. Ezike's notes from the July 16, 2008 state consultative exam that Dr. Ezike observed "Normal ability to grasp and manipulate," with grip strength of "four over five in both hands," and that Ms. Hurt was "able to pick up a penny with each hand . . . [a]nd pinch strength was 'minimally decreased bilaterally.'" (R. 365). Based on these notes, Dr. Leigh testified that "close handling did not, at this functioning, did not go back that far." (R. 365). However, Dr. Leigh also noted that during that same examination Ms. Hurt was complaining of "[p]ain in her knuckles," "occasional hand weakness, resulting in dropped objects," and "difficulty opening jars and bottle tops." (R. 366 (quotations omitted)). Thus, Dr. Leigh noted that there was a "discrepancy between what the claimant said she was having trouble doing . . . . And objectively, what the examiner recorded." (R. 367). However, Dr.

Leigh did testify that Ms. Hurt's kyphosis, stenosis, and degenerative joint disease would all result in pain, that she had had numerous treatments other than surgery to alleviate this pain, that according to the record "not a single one of her treating doctor [had] doubted her complaints of pain," and that Ms. Hurt had taken at one time or another a number of medications for pain including, but not limited to, Celebrex, Flexeril, tramadol, and hydrocodone.[6]  (R. 359, 369).

### c.
### The Vocational Expert's Testimony

The ALJ posed a series of hypotheticals to the vocational expert ("VE"), each including an array of limitations on capacity for work.   The first assumed a capacity for light work – lifting no more than 20 pounds and frequently carry up to 10 pounds, walking, standing, or sitting up to six hours each day – with a series of additional limitations on activities like climbing (never), crawling (never), reaching overhead (occasionally).  (R. 396).  The VE stated that an indivdual with such limitations could not perform Ms. Hurt's bus driving job, but could perform her data entry job.  (R. 397).  The ALJ then added the additional limitation that the hypothetical individual could frequently, but not consistently, perform handling requiring gross manipulations.  The VE explained that the data entry job was still a possibility, as it required frequent reaching and handling, and constant fingering.   (R. 397).   That job remained a possibility even if the capacity for work were reduced to sedentary.  (R. 398).  It would not allow for a sit-stand option, however.  (R. 399).

### III.

### The ALJ's Decision

The ALJ found that, during the period at issue, Ms. Hurt suffered from the following severe impairments: "osteoarthritis, right shoulder and right hand; stenosis, lumbar spine,

---

[6] *See* R. 369 ("And she was taking Celebrex, Flexeril, Tramadol, at that time, July of '08.").

secondary to degenerative disc disease; status-post spine surgery secondary to Scheuermann's disease (kyphosis) . . . ." (R. 324). He further found that Ms. Hurt did not have an impairment or combination of impairments that met or equaled a listed impairment. (R. 324). Specifically, the ALJ found that her impairments did not meet listings 1.02 (major dysfunction of a joint) or 1.04 (disorders of the spine). (R. 324-27).

The ALJ then determined that Ms. Hurt retained the capacity to perform light work, with a number of additional limitations. She could never climb ladders, ropes, or scaffolds; she could occasionally stoop, crouch, kneel, or crawl. She could perform no more than frequent gross manipulation. She could not do any commercial driving, and had to avoid exposure to dangerous moving machinery, vibration, slippery or uneven surfaces, and cold. (R. 328). After recounting Ms. Hurt's testimony and the medical evidence, the ALJ decided that Ms. Hurt was not credible because her daily activities showed she was "quite functional" and the medical evidence undermined her claims. (R. 331). The ALJ then determined that, during the period at issue, Ms. Hurt could perform her past work as a data entry clerk. (R. 335). Accordingly, she was not disabled and not entitled to benefits during that period. As of May 28, 2011, however, she was disabled. (R. 335-36).

## IV.
### Discussion

### A.
### Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*,

402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

**B.**
**The Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.
### Analysis

This case, like most Social Security disability case, is, at bottom, about the claimant's credibility. If the case is in federal court, the claimant claims she is unable to work and the ALJ doesn't believe her. An ALJ does not have to believe an applicant for benefits, of course, *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996), but if he doesn't, he has to explain why and support his explanation with specific reasons "supported by the record." *Engstrand v. Colvin,* 788 F.3d 655, 660 (7th Cir. 2015); *Minnick v. Colvin,* 775 F.3d 929, 937 (7th Cir. 2015).

An ALJ's credibility determination can only be overturned if it is "patenetly wrong." *Stepp v. Colvin*, 795 F.3d 711, 720 (7th Cir. 2015); *Engstrand v. Colvin*, 788 F.3d 655, 660 (7th Cir. 2015). The deference afforded an ALJ's credibility finding stems from the fact that the ALJ, and not the reviewing court, "is in the best position to determine a witness's truthfulness

and forthrightness", *Stepp,* 795 F.3d at 720, as the reviewing court "lack[s] . . . the opportunity to observe the claimant testifying." *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015); *but see United States v. Pickering*, 794 F.3d 802, 805 (7th Cir. 2015)(criticizing demeanor evidence as an "unreliable clue to truthfulness"); *Consolidation Services, Inc. v. KeyBank Nat. Ass'n*, 185 F.3d 817, 821 (7th Cir. 1999)("Much pious lore to the contrary notwithstanding, 'demeanor' is an unreliable guide to truthfulness."). But when an ALJ rests his credibility on objective factors or implausibilities rather than on a claimant's demeanor or other subjective factors, the court has greater leeway to evaluate the ALJ's determination. *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013); *Schomas v. Colvin,* 732 F.3d 702, 708 (7th Cir.2013).

That's the position we are in here. The ALJ said he didn't believe Ms. Hurt's "allegations regarding the limiting effects and the severity of her symptoms . . . ." (R. 333, 334). He explained that:

> The record and the claimant's testimony indicate that despite her pain, the claimant was capable of performing work-related activities. On October 30, 2009 VNA records reflect musculoskeletal exam and neurological exam "wnl" (within normal limits)
>
> In her testimony at the 2009 hearing, the claimant presented herself as quite functional.

(R. 331). So, the ALJ rested his credibility determination not on demeanor, but on the medical evidence and Ms. Hurt's daily activities. Unfortunately, that's a double helping of trouble from the Seventh Circuit, which has repeatedly taken ALJ's to task for attempting to equate doing a few chores around the house to holding down an eight-hour-a-day, seven-day-a-week, full-time job. *Engstrand*, 788 F.3d at 661 (ALJ "failed to understand that working sporadically or performing household chores are not inconsistent with being unable to engage in substantial gainful activity."); *Moore v. Colvin,* 743 F.3d 1118, 1126 (7th Cir.2014) (ALJs must recognize

that "full-time work does not allow for the flexibility to work around periods of incapacitation");
*Mendez v. Barnhart*, 439 F.3d 360, 362-63 (7th Cir. 2006)("The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work.").

The court has been especially critical when the claimant makes it clear that she might be able to do some work around the house, but only with regular breaks. *Kittelson v. Astrue*, 362 Fed.Appx. 553, 557-58 (7th Cir. 2010)("Because an ALJ is supposed to consider a claimant's limitations in performing household activities, the ALJ erred in failing to acknowledge that . . . when [claimant] was active she took frequent breaks."); *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009)("The ALJ here ignored [claimant's] numerous qualifications regarding her daily activities . . . ."). The ALJ committed just these types of errors here.

Having determined that Ms. Hurt was "quite functional" the ALJ went on to provide his idea of what that meant. It involved breaking household chores in to 15-minute stages with rest in between. It involved being able to drive to the hearing office. It involved grocery shopping – but usually with her husband's help – once a week. It involved needing to rest after shopping before doing something else. It involved reading and watching television. (R. 331). While the ALJ did not completely ignore Ms. Hurt's limitations in performing a few activities around the house – he did mention them, after all – he certainly didn't seem to think much of them if he thought, in his words, that they demonstrated she "was capable of performing work-related activities." (R. 331).

Despite that finding from the ALJ, the Commissioner unconvincingly argues that the ALJ was not equating Ms. Hurt's activities with a capacity for work. (Dkt. #21, at 5). According to the Commissioner, the ALJ was really saying that, because Ms. Hurt can perform sporadic

activities with frequent breaks, she can do more than she claims and is not credible. (Dkt. #21, at 5). But she *claims* she can only do sporadic activities so, if the ALJ took her at her word – and he certainly seems to have – how can that be a finding that she can do *more* than she claims? If the ALJ really meant what the Commissioner claims he meant, he certainly failed to build a logical bridge.

And so, we are left with the other premise the ALJ leaned on to find Ms. Hurt not credible: the medical evidence. This is another non-starter for the Seventh Circuit. The court has noted that ALJ 's dismissing complaints of pain because they are not substantiated by the medical evidence is a recurrent error and one that alone requires remand. *Adaire v. Colvin*, 778 F.3d 685, 687 (7th Cir. 2015). An ALJ cannot discredit a claimant's allegations based on the medical evidence alone, *Pierce v. Colvin,* 739 F.3d 1046, 1049–50 (7th Cir.2014); *Myles v. Astrue,* 582 F.3d 672, 676–77 (7th Cir.2009); *Johnson v. Barnhart,* 449 F.3d 804, 806 (7th Cir.2006); *Carradine v. Barnhart,* 360 F.3d 751, 753 (7th Cir.2004), and, with the ALJ's companion premise of Ms. Hurt's daily activities dropping out of the equation, that is what we are left with here. As the ALJ's credibility determination has no valid leg to stand on, this case must be remanded.

The Commissioner submits that the ALJ also discussed Ms. Hurt's use of medications and other measures to alleviate her pain. (Dkt. # 21, at 6). Indeed, the ALJ reported that

> she used prescription and over-the-counter pain relief medications, and she alternated heating pads and ice packs on her back. Those treatments did provide some relief, but the pain never completely went away. The claimant said that if she did not take prescription pain-relief medication she would not be able to sleep. . . . In addition to medication, the claimant would put ice on her hands to help with pain.

(R. 320). But while the ALJ did mention Ms. Hurt's treatment, he didn't discuss it, and so we don't know what he made of it. Ms. Hurt also underwent two back surgeries and epidurals.

Taking strong medications – such as narcotics like Tramadol or hydrocodone – and undergoing surgery and epidurals tends to bolster a claimant's credibility rather than detract from it. *Scrogham,* 765 F.3d 685, 701 (7th Cir. 2014); *Carradine v. Barnhart,* 360 F.3d 751, 755 (7th Cir.2004). But the ALJ drew no conclusions at all from the steps Ms. Hurt took to alleviate her pain.

There is another facet of the ALJ's treatment of Ms. Hurt's testimony about her limitations that should be addressed. The ALJ indicated that he accepted that Ms. Hurt could sit for no more than 30 minutes. (R. 333). He noted she had testified that after 30 minutes "she needed to move her legs . . . and walk or wiggle her legs until the pain eased." The pain decreased after fifteen minutes of moving around. (R. 329). But, despite clearly accepting Ms. Hurt's testimony about sitting, the ALJ did not make this limitation a part of his RFC finding or his hypotheticals to the VE. He was required to do so. *See Murphy v. Colvin*, 759 F.3d 811, 820 (7th Cir. 2014)(ALJ is required to incorporate into the hypotheticals those impairments and limitations that the ALJ accepts as credible); *Schmidt v. Astrue,* 496 F.3d 833, 846 (7th Cir.2007). The mistake is magnified here because the VE testified that Ms. Hurt's past work – which the ALJ ultimately found her capable of performing – did not allow for a sit/stand option. A data entry clerk could not take a 15-minute break to walk around every thirty minutes to ease her pain because "they need to be able to remain working at the computer a minimum of 85 percent of the work time in order to get the work done." (R. 399). So, given the ALJ's finding that Ms. Hurt had to get up and stretch her legs for 15 minutes after every 30 minutes of sitting, she couldn't perform her past work.

One final point: the claimant asks that the court remand this matter, not merely for further proceedings, but with instructions to calculate and award benefits. This is, of course, within the court's power under 42 USC §405(g), but is only appropriate "if all factual issues

involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011). We cannot say that is the case here, because remand is prompted not by the ALJ's decision being necessarily wrong, but by his failure to adequately articulate and support his conclusions. That being said, we do note that, although this is the second time through the system for this case, the ALJ maintained his focus on the objective medical evidence as a reason for disbelieving Ms. Hurt, and continued to use her rather limited and sporadic activities as evidence of her ability to work. As was pointed out here and in the previous review, – not to mention the order of November 14 2013 – this runs counter to Seventh Circuit case law. As such, the Commissioner is urged to assign this matter to a different ALJ on remand. *See Golembiewski v. Barnhart,* 322 F.3d 912, 918 (7th Cir.2003); *Sarchet v. Chater,* 78 F.3d 305, 309 (7th Cir.1996).

## CONCLUSION

The plaintiff's motion for remand [Dkt. # 13] is GRANTED.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 10/20/15